Filed 8/6/26  In re Pride CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re DAVID CODELL PRIDE<br><br>on Habeas Corpus. | E085951<br><br>(Super.Ct.Nos. WHCSB2500007 & SCR57051)<br><br>OPINION |

ORIGINAL PROCEEDINGS; petition for writ of habeas corpus.  Gregory S. Tavill, Judge.  Petition granted.

Annie Fraser, under appointment by the Court of Appeal, for Petitioner.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Donald Ostertag, Stephanie H. Chow and Sahar Karimi, Deputy Attorneys General, for Respondent.

## INTRODUCTION

David Pride filed a habeas corpus petition in the superior court, alleging that his 1992 convictions for first degree murder and robbery were obtained "on the basis of race, ethnicity, or national origin" in violation of the California Racial Justice Act of 2020 (Stats. 2020, ch. 317, § 1 (the RJA); Pen. Code, § 745, subd. (a)).[1] Pride also requested, pursuant to the RJA, appointment of counsel and disclosure of evidence to support his claims. (§§ 745, subds. (a)(4), (d), 1473, subd. (e).) The trial court denied the discovery request and the habeas petition, concluding that Pride failed to establish a prima facie case for relief under the RJA.

In this writ proceeding, Pride argues that the court erred by—(1) failing to consider and grant his request for appointment of counsel and (2) applying the wrong standard for determining whether he demonstrated "good cause" under section 745, subdivision (d), to obtain evidence relevant to a potential violation of the RJA. For the reasons explained below, we agree on both points. We therefore grant the petition and issue a writ of mandate directing the trial court to vacate its order denying the habeas petition, appoint counsel for Pride, and conduct a new hearing to reconsider his discovery request in a manner consistent with this opinion.

## BACKGROUND

In 1992, a jury convicted Pride, who is Black, of robbery (§ 211) and first degree murder (§ 187, subd. (a)). The jury also found true the robbery-murder special

---

[1] Unlabeled statutory citations refer to the Penal Code.

circumstance allegation (§ 190.2, subd. (a)(17)) and found that Pride personally used a firearm in the commission of both offenses (§§ 1203.06, subd (a)(1), 12022.5, subd. (a)). (*People v. Pride* (Nov. 28, 1994, E011871 [nonpub. opn.].)  At trial, the prosecution presented evidence that the victim, Mario Gomez, was shot nine times and killed outside of Top Cat Liquor Store in San Bernardino during a robbery in which Pride participated. (*People v. Pride*, *supra*, E011871.)  Following a tip from an eye-witness and a trail of blood, the police found Pride in a field north of the liquor store's parking lot.  (*People v. Pride*, *supra*, E011871.)  He had sustained three gunshot wounds and was lying on his side, next to an empty semi-automatic firearm and the keys to the car Gomez had driven to the store.  (*People v. Pride*, *supra*, E011871.)

The trial court sentenced Pride to life in prison without the possibility of parole, plus three years for the robbery and nine years total for the two firearm enhancements. (*People v. Pride*, *supra*, E011871.)  Pride appealed his conviction, arguing various instructional and sentencing errors, and in an unpublished opinion, we ordered the robbery sentence stayed under section 654 but otherwise affirmed the judgment.  (*People v. Pride*, *supra*, E011871.)

In December 2024, Pride filed a habeas corpus petition and a motion for discovery under section 745, subdivision (d), in the superior court.  In the habeas petition, Pride alleged that his prosecution, conviction, and sentence were unlawfully influenced by racial bias, and he requested an evidentiary hearing under the RJA.  Pride asserted three distinct violations of the RJA.  First, he alleged that the prosecutor and public defender in his case discussed his race and the importance of convicting him of the victim's murder

3

to avoid inciting race-based violence within the county. In support, he attached a declaration from Carolyn Williams, a friend of his sibling, who had been volunteering at the San Bernardino County Superior Court in 1992. Williams stated that while riding the elevator, she overheard a conversation between two attorneys whom she later learned—when she attended part of Pride's trial—were the prosecutor and public defender in his case. According to Williams, the prosecutor told the public defender that "he owed her a favor" and that she "needed a favor" in the "Top Cat Liquor Store case." The prosecutor told the public defender, "If your client walks, … they would kill him, and we would have more murders on our hands between the Blacks and the Hispanics." The public defender responded, "You are probably right."

Second, Pride alleged that the investigating officers "displayed racial bias" toward him to secure his confession. Specifically, he claimed that, during the interview in which he confessed to Gomez's murder, one of the detectives said to him, " 'Just go ahead and tell me you did it and we are done and out of here' " and then added, " 'I just want to know what David Pride did that night cause it's gonna go down no matter what.' " Pride alleged that the phrases " 'outta here' " and " 'it's gonna go down no matter what' " are racially biased slang terms. In support, he attached the transcript of the interview as well as a declaration from Blair C. Hall, a retired San Bernardino County police officer, who stated that the phrase " 'it's gonna go down' " consists of "ebonics" or Black "slang" that reference violence and indicate that something bad is going to happen.

Third, Pride alleged that his arrest was the result of racial profiling because he "did not meet the [eye-witnesses'] suspect description other than being a 'Black Male.' "

4

He claimed that his "previous arrest record" established that he had been arrested and charged with various crimes based solely on fact that he was Black and was wearing an " 'OAKLAND RAIDERS JACKET HOODIE.' " Pride relied on Hall's declaration to support these allegations as well. In his declaration, Hall stated that, as a police officer for San Bernardino County, he had been "trained to target people of color as potential suspects of criminal activity who wore 'Oakland Raiders Jacket[s] and Hoodies' in certain areas of San Bernardino that are considered 'High Crime Areas' or 'Hot Spots,' " like the Top Cat Liquor Store, "which happens to be in the center of several rival gangs." Hall opined that Pride's "credibility would have been greatly affected simply because of the area [of the shooting], his race black male and his clothing 'Hooded Oakland Raiders Jacket.' " Hall stated: "It is my opinion based on the lack of evidence and the conduct of the detectives that Mr. Pride was targeted based on race, his clothing 'Oakland Raiders Jacket Hoodie,' the area which this crime took place and his admissions were coerced and his waiver of his Miranda rights invalid. Not a single witness described petitioner's clothing, nor his face or hair or any other identifying remarks other than being 'BLACK MALE,' which in my opinion Mr. Pride was charged and convicted based on race."

In his discovery motion, Pride alleged that statistical data showed that San Bernardino County "targeted blacks and people of color for arrests, stops, and convictions at a disproportionate rate than whites." In support, he attached excerpts of appendices published by the Public Policy Institute of California, which contain analyses of arrest rates across the state, broken down by certain ethnicities, with some county-specific information. One of the appendices contains the statement that Black arrest rates

5

are higher than white arrest rates in all of California's counties but two—Lassen and Del Norte.

Relevant to his RJA allegations, Pride requested the following categories of information:

"1.  Any and all police reports documenting [my] prior arrest history and probable cause determinations that lead to the issuance of arrest warrants for arrest from 1998-1992," including an arrest "from a[n] incident that occurred in the Medow Brook Apartment complex for alleged gun possession and arrest on King Street which was later dismissed at the preliminary hearing on this case due to a lack of probable cause; a robbery charge which was also dismissed for a lack of identification based on lack of probable cause to arrest; an arrest for driving a vehicle without the owner[']s consent which was also dismissed for a lack of probable cause all while wearing Oakland Raiders Jacket Hoodie.

"2.  Any and all documentation of the officers associated with my prior arrest history of racially charged arrests, bia[s] or racism, any complaints concerning false arrest and planting or arguing false evidence in police reports concerning people of color.

"3.  Any and all complaints, charges, disciplinary records or actions taken, including investigations associated with this case based on racially motivated statements, charges, prosecutions, or reversals of convictions based on the same [associated] with Deputy [D]istrict [A]ttorney Sylvia Husing, Deputy [P]ublic [D]efender Jerry Sovereign and Judge Bob Krug.

"4.  Any and all documentation known and unknown as to any complaints or [lawsuits] filed against the San Bernardino Sheriff's and Police associated with excessive force, false arrests, arrests [without] probable cause, falsification of evidence aga[i]nst people of color and any documented policies bearing on targeting people of color between the years of 1985-1995, associated with Det. Madril, Det. Duffy, Dep. Lupercio, Dep. Wendal Anderson, Criminalist William Matty and William Blondet and Crime Lab Tech David Stockwell.

"5.  Any statistical data associated racial disparities in stops, arrests, charges and prosecutions among blacks versus whites in San Bernardino [C]ounty, any policies made that included blacks or people as targets to clean the county up."

On February 14, 2025, Pride filed a motion seeking leave to amend his discovery motion and requesting the appointment of counsel under 1473, subdivision (e), to assist in preparing his RJA claims.

On February 18, 2025, the trial court issued an order denying Pride's habeas petition and discovery motion.  The court addressed each alleged RJA violation and concluded that Pride failed to make a prima facie showing entitling him to an evidentiary hearing.  As to the allegation that the prosecutor and public defender discussed working together to convict Pride for reasons relating to his race, the court concluded that the "conversation allegedly overheard by Carolyn Williams" in the elevator during Pride's trial did not "have anything to do with racial 'bias or animus.' "

As to the allegation that a detective used racially biased language during an interview, the court concluded that the language Pride cited did "not have any racial

7

component at all" and did not constitute " 'charged or racially coded language.' " Regarding the allegation that Pride's arrest was the result of racial profiling, the court concluded that any witness descriptions of the perpetrator as being a Black male were irrelevant because the RJA does not apply to the conduct of lay witnesses. The court further concluded that the allegations of racial profiling based on Pride's previous arrests were also irrelevant because they did not show that any law enforcement officers exhibited racial bias in the present case. Finally, the court concluded that Pride failed to make a prima facie case of disparate charging and sentencing treatment because he failed to present "information about the number of persons 'similarly situated' to [him] that engaged in 'similar conduct' that resulted in different outcomes in San Bernardino County based on race or ethnicity."

The trial court also denied Pride's request for discovery. Citing *Young v. Superior Court* (2022) 79 Cal.App.5th 138 (*Young*), the court observed that, " 'in order to establish good cause for discovery under the Racial Justice Act, a defendant is required only to advance a plausible factual foundation, based on specific facts, that a violation of the Racial Justice Act "could or might have occurred" in his case.' " The court concluded: "As explained *ante*, [Pride] has not alleged a violation of the Racial Justice Act, and therefore he has no right to the discovery he seeks." The court did not address Pride's request for counsel.

Pride filed a timely petition for a writ of mandate challenging the trial court's denial of his habeas petition and his request for appointment of counsel, discovery, and an evidentiary hearing under the RJA. We appointed counsel for Pride and issued an

8

order to show cause limited to the questions of whether he was entitled to appointment of counsel and discovery under the RJA.

## DISCUSSION

Pride contends that the trial court erred by failing to rule on his request for counsel and that he demonstrated his entitlement to counsel. Pride also contends that the trial court erred by concluding he failed to demonstrate good cause for discovery. He asks that we either direct the court to grant his discovery request or hold a new hearing on his discovery motion and consider his requests under the proper legal standard. As we explain, we agree that Pride is entitled to appointment of counsel. We also agree that the trial court misapplied the good cause standard and that Pride demonstrated a plausible factual foundation for discovery on at least one of his RJA claims. However, because Pride is entitled to counsel to assist him in pursuing his RJA claims and because there remain discretionary decisions to be made regarding the proper scope of any disclosures, we will remand to the trial court to make those discovery decisions in the first instance.

A. *Standard of Review*

"Ordinarily, mandate does not lie to correct judicial errors by the superior court in habeas corpus proceedings." (*McIntosh v. Superior Court* (2025) 110 Cal.App.5th 33, 46.) However, where, as here, "the trial court failed to perform its required duty to conduct an independent assessment of whether [the petitioner] was entitled to have counsel appointed under newly adopted procedures enacted by the Legislature," then " ' "mandate may be used to compel the performance of [that] duty." ' " (*Id.* at pp. 46-47.) In addition, several of our sister courts have concluded that writ review of the trial

9

court's discovery rulings in RJA cases is appropriate because such rulings involve novel legal issues of widespread interest. (E.g., *Young, supra*, 79 Cal.App.5th at p. 156; *Gonzales v. Superior Court* (2024) 108 Cal.App.5th Supp. 36, 53-54 (*Gonzales*); *McDaniel v. Superior Court* (2025) 111 Cal.App.5th 228, 238 (*McDaniel*).) The RJA is a recent legislation that has been amended multiple times since its inception, and although its "command is simple, … [its] implementation is somewhat complex." (*Young, supra*, 79 Cal.App.5th at p. 147.) We therefore agree with *Young* that exercising our discretion to review discovery rulings under the RJA is appropriate to provide " 'general guidelines … for future cases.' " (*Young, supra*, 79 Cal.App.5th at p. 156.)

Because " 'management of discovery lies within the sound discretion of the trial court,' " we review discovery rulings for abuse of discretion. (*Young, supra*, 79 Cal.App.5th at p. 156.) "We review the factual underpinnings of a discretionary determination for substantial evidence [citation], but where such a determination rests on 'incorrect legal premises,' our review is de novo." (*Ibid.*) A discretionary order based on an application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion and is subject to reversal. (*Gonzales, supra*, 108 Cal.App.5th Supp. at p. 55.)

B.    *Overview of the RJA*

Effective January 1, 2021, the Legislature enacted the RJA (Assembly Bill No. 2542 (2019–2020 Reg. Sess.)) "to eliminate racial bias from California's criminal justice system"; "to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing"; and "to ensure that individuals have access to all relevant evidence,

10

including statistical evidence, regarding potential discrimination in seeking or obtaining convictions or imposing sentences" (Stats. 2020, ch. 317, § 2(i), (j)).  To achieve these objectives, the RJA added section 745 to the Penal Code (Stats. 2020, ch. 317, § 3.5) and amended sections 1473 and 1473.7 (Stats. 2020, ch. 317, §§ 4, 5) to allow defendants whose judgments are final or who are no longer in custody, respectively, to seek relief for RJA violations.  (See generally *In re Lynex* (2026) 118 Cal.App.5th 756, 767.)

The RJA provides that "[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin." (§ 745, subd. (a).)  The statute further "sets forth four categories of conduct, any of which, if proved, is enough to 'establish' a violation" of the RJA.  (*Young*, *supra*, 79 Cal.App.5th at p. 147.)  The three types of conduct relevant to Pride's allegations are: (1) when "[t]he judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin" (§ 745, subd. (a)(1)); (2) when "[t]he defendant was charged or convicted of a more serious offense than defendants of other races, ethnicities, or national origins who commit similar offenses and are similarly situated, and the evidence establishes that the prosecution more frequently sought or obtained convictions for more serious offenses against people who share the defendant's race, ethnicity, or national origin in the county where the convictions were sought or obtained" (§ 745, subd. (a)(3)); and (3) when "[a] longer or more severe sentence was imposed on the defendant than was imposed on other similarly situated individuals convicted of the same offense, and longer or more severe sentences were more frequently

11

imposed for that offense on people that share the defendant's race, ethnicity, or national origin than on defendants of other races, ethnicities, or national origins in the county where the sentence was imposed" (§ 745, subd. (a)(4); Stats. 2020, ch. 317, § 3.5).

Initially, the RJA applied only prospectively to cases in which judgment had not yet been entered as of the Act's effective date.  (§ 745, former subd. (j); Stats. 2020, ch. 317, § 3.5.)  However, beginning January 1, 2024, the RJA applies to all cases in which the petitioner is currently serving a sentence in state prison regardless of when the judgment or disposition became final.  (§ 745, subd. (j)(3); Stats. 2023, ch. 311, § 6.)

The RJA itself provides that a defendant in custody may file a habeas corpus petition alleging a violation of the statute.  (§ 745, subd. (b).)  "The RJA also amended section 1473, which identifies bases for prosecuting a petition for writ of habeas corpus, to add a subdivision governing the litigation of RJA claims."  (*People v. Wilson* (2024) 16 Cal.5th 874, 945; see § 1473, subd. (e).)

In preparation for filing such a petition, the RJA authorizes discovery and the appointment of counsel.  (§§ 745, subd. (d); 1473, subd. (e).)  If a petition makes a prima facie showing of entitlement to relief under the RJA, the trial court must issue an order to show cause and hold an evidentiary hearing.  (§ 1473, subd. (e)(7)(B).)  If the court finds a violation of section 745, subdivision (a), "the court shall impose one or more of the applicable remedies as outlined in subdivision (e) of Section 745."  (§ 1473, subd. (e)(8); Stats. 2025, ch. 784, § 3.5.)

As we explain below, Pride has established sufficient justification for appointment of counsel and discovery under the RJA.

12

C.      *Pride Alleged Facts Sufficient for the Appointment of Counsel*

At the appointment of counsel stage, "the court shall appoint counsel if the petitioner cannot afford counsel and . . . the petition alleges facts that would establish a violation of subdivision (a) of Section 745." (§ 1473, subd. (f); Stats. 2020, ch. 317, § 4.) In Assembly Bill No. 1071, the Legislature "reaffirm[ed]" that this threshold "is extremely low." (Stats. 2025, ch. 721, § 1, subd. (b).) Assembly Bill No. 1071 states that courts "have imposed on RJA petitioners higher burdens than the Legislature intended to meet the threshol[d] to secure counsel" and "denied counsel to litigants raising RJA claims far more than they have appointed counsel." (*Ibid.*) The new legislation "clarifies that the court shall appoint counsel to all indigent postconviction litigants who allege a plausible claim of an RJA violation," which "does not require a prima facie showing" and "should be construed as a minimal pleading requirement." (*Ibid.*; see generally *McIntosh v. Superior Court* (2025) 110 Cal.App.5th 33.)

The RJA defines a " '[p]rima facie showing' " to "mea[n] that the defendant *produces facts* that, if true, establish that there is a substantial likelihood that a violation of [the RJA] occurred." (§ 745, subd. (h)(2), italics added.) "By contrast, to be entitled to counsel in RJA habeas proceedings, petitioners are required only to '*allege*[ ] *facts* that would establish a violation of [the RJA].' " (*McIntosh*, *supra*, 110 Cal.App.5th at p. 45.)

Pride satisfied the minimal pleading requirement to secure RJA counsel by alleging that his trial counsel discussed with the prosecutor the importance of obtaining a conviction in his murder trial to avoid future incidents of racial unrest in the area where the murder occurred. That allegation, if true, would establish a violation of the RJA

13

because it describes a circumstance where "an attorney in the case … exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin." (§ 745, subd. (a)(1).) Pride also submitted a declaration from Williams, who described the conversation in detail and stated that she personally overheard it. Although not necessary to satisfy the pleading requirement, the declaration certainly strengthened Pride's allegation by providing specificity.

The trial court did not expressly rule on Pride's request for appointed counsel in its written ruling. However, the court did address Pride's allegation of attorney racial bias in its prima facie analysis when it concluded that the elevator conversation that Williams declared she overheard did not "have anything to do with racial 'bias or animus.'" That conclusion was flawed because it ignores a reasonable interpretation of the prosecutor's remark. To be sure, it is possible to reasonably interpret the prosecutor's remark to be devoid of racial animus or bias, as the trial court did. For example, the prosecutor may have been conveying one aspect of why it was important to convict a defendant she believed to be guilty—namely, to avoid attempts at self-help or vigilante justice within the community where the killing occurred. However, it is also possible to reasonably interpret the prosecutor's remark as expressing a belief that the defendant should be convicted solely to avoid race wars, regardless of his guilt. Because we must accept as true the statements in Williams's declaration, and because the statements attributed to the prosecutor (and also possibly the public defender, who, according to Williams, agreed with the prosecutor's remark) are susceptible to multiple reasonable interpretations, one

of which involves racial bias, we conclude that Pride demonstrated entitlement to counsel to assist him in pursuing his RJA claim.

Because we conclude that Pride's attorney racial bias allegation is sufficient to clear the threshold to secure RJA counsel, we need not analyze the sufficiency of his other RJA allegations.  On remand, the trial court shall appoint counsel for Pride to assist him in asserting his RJA claims.  And, because section 1473, subdivision (e)(5), permits "[n]ewly appointed counsel [to] amend a petition filed before their appointment," the trial court shall allow Pride to file an amended petition with the help of his counsel if he so desires.

D.       *Pride Demonstrated a Plausible Justification for Discovery*

The RJA's discovery provision—section 745, subdivision (d)—states:  "A defendant may file a motion requesting disclosure to the defense of all evidence relevant to a potential violation of subdivision (a) in the possession or control of the state.  A motion filed under this section shall describe the type of records or information the defendant seeks.  Upon a showing of good cause, the court shall order the records to be released."  (Stats. 2020, ch. 317, § 3.5.)

The leading appellate opinion addressing what constitutes "good cause" for purposes of discovery under section 745, subdivision (d), is *Young*.  In that case, our colleagues in Division Four of the First Appellate District comprehensively analyzed the text, legislative history, and legal background of the RJA alongside the provisions generally governing discovery in criminal cases.  (*Young*, *supra*, 79 Cal.App.5th at

15

pp. 149–160.)  Borrowing from the *Pitchess*[2] standard for discovery of law enforcement

personnel records, *Young* held that "a defendant is required only to advance a plausible

factual foundation, based on specific facts, that a violation of the [RJA] 'could or might

have occurred' in his case."  (*Young*, at p. 159.)

Young found support for the plausible justification standard in "the escalating

burdens of proof" contained in section 745.  (*Young*, *supra*, 79 Cal.App.5th at p. 160.)

"The burden at the discovery stage is a good cause showing, the burden at the prima facie

stage is higher, and the burden at the evidentiary hearing is higher still—proof of an RJA

violation by a preponderance of the evidence."  (*Gonzales v. Superior Court* (2024)

108 Cal.App.5th Supp. 36, 61 (*Gonzales*), citing § 745, subds. (c), (d) & (e).)  *Young*

observed that, as "the least onerous" of the statute's burdens of proof, the plausible

justification standard "should not be difficult to meet."  (*Young*, at p. 161.)  *Young*

observed:  "Where the defendant makes a showing of plausible justification that there

was or could have been a violation of the [RJA], thus triggering access to 'all relevant

evidence' [citation] concerning a potential violation of section 745, subdivision (a), it will

likely be an abuse of discretion to 'totally foreclose[ ]' discovery."  (*Young*, at pp. 168–

169.)

We conclude that the Williams declaration Pride submitted in support of his

allegation of racial bias by the prosecutor and public defender is sufficient to demonstrate

a plausible justification, based on specific facts, that a violation of section 745,

---

[2] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

16

subdivision (a)(1), could have occurred during his trial. At the discovery stage, as at the prima facie stage, the court "should not weigh the evidence or make credibility determinations, except in the rare case where the record 'irrefutably establishes' that [the] allegations are false." (*Finley v. Superior Court* (2023) 95 Cal.App.5th 12, 23–24; see *McDaniel*, *supra*, 111 Cal.App.5th at p. 246, fn. 8 ["A trial court's review of [supporting evidence] at the discovery stage, which imposes … even a lower burden of proof on defendants [than the prima facie stage], must be more lenient."].) As explained above, if the conversation between the two attorneys occurred as Williams described, then the trial court was incorrect to conclude that their discussion could not be reasonably interpreted to convey racial bias. Under one reasonable interpretation, the attorneys discussed the importance of securing a conviction because of Pride's race and the ethnicity of the victim. We therefore conclude that, at this early stage, Pride has demonstrated that the conversation appears to have involved the type of racial animus the RJA was enacted to address. (See Assem. Bill No. 2542 (2019–2020 Reg. Sess.) § 2(i) [The Legislature's express intent in enacting the RJA was to "eliminate racial bias from California's criminal justice system" and "ensure that race plays no role at all in seeking or obtaining convictions or in sentencing."].)

The People contend that Williams's declaration is too vague and speculative to satisfy the plausible justification standard because the conversation allegedly occurred 18 years before and was about a liquor store that is located in a "high crime area where many shootings occur." According to the People, Willaims did not supply enough information to demonstrate that the conversation was about Pride. We disagree. The

17

People's argument could be successful at the prima facie or evidentiary hearing stage, but it is unavailing at the discovery stage. The details Williams provided in her declaration are specific enough to show that it is plausible that an attorney in Pride's case exhibited bias toward him because of his race. (§ 745, subd. (a)(1).) This is because Williams stated that she attended part of Pride's trial and observed that the prosecutor and public defender were the same attorneys she overheard in the elevator and because the case they were discussing involved the same liquor store where the murder in Pride's trial took place.

Whether Pride will be able to demonstrate a "substantial likelihood" of an RJA violation based on Williams's declaration and whether he will be able to prove an RJA violation by a "preponderance of the evidence" are not the issues before us. At this early stage, the statements in Williams's declaration are sufficient to "advance a plausible factual foundation, based on specific facts, that a violation of the [RJA] 'could or might have occurred.' " (*Young*, at pp. 159, 160.)

The trial court's conclusion that Pride failed to demonstrate good cause for discovery was based in part on its incorrect interpretation of the conversation as being race-neutral and, in part, on its conflation of the good cause standard with the prima facie standard. In explaining why it was denying the discovery motion, the court stated that, "[a]s explained *ante,*" (that is in the section of the ruling concluding that Pride failed to make a prima facie showing of an RJA violation), Pride "has not alleged a violation of the Racial Justice Act, and therefore he has no right to the discovery he seeks." Thus, although the trial court cited the correct legal standard for good cause when it quoted

18

*Young,* it misapplied that standard by concluding that Pride's failure to make a prima facie showing of an RJA violation meant that he was not entitled to discovery. A good cause showing does not require that the petitioner allege "a violation of the Racial Justice Act"; it requires the petitioner "only to advance a plausible factual foundation, based on specific facts, that a violation of the [RJA] 'could or might have occurred' in his case." (*Young,* at p. 159.)

For all of these reasons, we conclude that it was an abuse of discretion for the trial court to " 'totally foreclose[ ]' discovery." (*Young,* at p. 169.)

E.      *Remand Is Necessary for the Court To Determine the Scope of Discovery*

Although Pride "has offered sufficient evidence to demonstrate a plausible factual foundation for discovery under the RJA, a question remains regarding the appropriate scope of his request." (*McDaniel, supra,* 111 Cal.App.5th at p. 248.) As *Young* explained, "plausible justification is merely a threshold consideration." (*Young, supra,* 79 Cal.App.5th at p. 144.) When determining if a petitioner is entitled to the requested discovery, the court must still " 'consider and balance' " the so-called *Alhambra*[3] factors: " '(1) whether the material requested is adequately described, (2) whether the requested material is reasonably available to the governmental entity from which it is sought (and not readily available to the defendant from other sources), (3) whether production of the records containing the requested information would violate (i) third party confidentiality or privacy rights or (ii) any protected governmental interest, (4) whether the defendant

---

[3]  *City of Alhambra v. Superior Court* (1988) 205 Cal.App.3d 1118, 1134.

has acted in a timely manner, (5) whether the time required to produce the requested information will necessitate an unreasonable delay of [the] defendant's trial, [and] (6) whether the production of the records containing the requested information would place an unreasonable burden on the governmental entity involved.' " (*Young*, at pp. 144–145.)

In addition, the court must "conside[r] whether [the] requests for disclosure may give rise to relevant evidence," meaning that the court "must determine whether they are 'reasonably calculated to lead to discovery of admissible evidence probative of a section 745, subdivision (a) violation." (*McDaniel*, *supra*, 111 Cal.App.5th at p. 248.) " 'The trial courts in exercising their discretion should keep in mind that the Legislature has suggested that, where possible, the courts should impose partial limitations rather than outright denial of discovery.' " (*Williams v. Superior Court*, *supra*, 3 Cal.5th at p. 559.)

Here, as in *Gonzales* and *McDaniel*, "[t]he trial court erred in its interpretation or application of [the good cause standard in] section 745," and as a result, the court "stopped short of fully exercising its discretion as to the balance of the *Alhambra* factors in determining good cause and then potentially establishing the scope of any disclosure allowed." (*Gonzales*, *supra*, 108 Cal.App.5th Supp. 36 at p. 66; see *McDaniel*, *supra*, 111 Cal.App.5th at pp. 248-249.) When this occurs, the appropriate remedy is to "remand to the trial court to engage in a discretionary weighing of the *Alhambra* factors, including the potential probative value of the information he seeks, and the burdens of gathering the requested 'records or information' for disclosure." (*McDaniel*, at p. 249, citing *Young*, *supra*, 79 Cal.App.5th at pp. 160, 168-169.)

20

As a final point, we note that Pride alleged violations of the RJA in addition to the attorney bias allegation we address in this opinion and that he requested the disclosure of evidence related to those other alleged violations. However, because the RJA allows for newly appointed counsel to amend the petition and request discovery (§ 1473, subd. (e)), once represented, Pride may wish to file a new petition and discovery requests with the help of counsel. As a result, we leave it to the trial court to address on remand whether Pride is entitled to discovery—and the proper scope of that discovery—in connection with the attorney bias allegation and any other RJA violations for which he demonstrates a plausible justification for discovery.

DISPOSITION

Let a writ of mandate issue directing the trial court to (1) vacate its February 18, 2025 order denying Pride's habeas petition and his discovery motion under the RJA, (2) appoint counsel to assist Pride in asserting his RJA claims, (3) conduct a new hearing on Pride's discovery motion or amended discovery motion, and (4) conduct any further proceedings consistent with this opinion.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS
J.

We concur:

RAMIREZ
P. J.

CODRINGTON
J.